This is a suit under the Workmen's Compensation Law, Act No. 20 of 1914, as amended, for alleged injuries sustained in an accident on August 8, 1947, by plaintiff, Hammison Deshotels, in the course and scope of his employment as a truck driver and driver's helper for Nelson Fruge, doing business as the Nelson Fruge Truck Lines of Mamou, Louisiana and being the assured of defendant Highway Insurance Underwriters Corporation. It is shown that at about 2:00 P.M. on August 8, 1947, an accident was sustained by plaintiff in the course and scope of his employment, in that while unloading pipes from a truck, one of the pipes, being a three-inch pipe measuring about twenty-five feet in length and weighing one hundred fifty pounds fell upon his right foot. It is alleged that as a result the plaintiff sustained a fracture of the shaft of the second metatarsal bone and was disabled and remained permanently disabled from performing his usual and customary occupation as a truck driver or driver's helper. It is shown that his average weekly wage was $30 per week and demand is made for compensation at the rate of sixty-five (65%) per cent of said weekly wage subject to a credit of twenty (20) weeks compensation heretofore paid, plus certain medical benefits and legal interest from judicial demand.
The defense is to the effect that while there is no real dispute as to the happening of an accident in the course and scope of the employment, there is a serious dispute as to whether any disability now existing, if any exists, is connected with the accident involved herein. The main contention of the defendant is that the plaintiff is not suffering from any disability resulting from the accident, and that such disability as he may have is due to a condition attributable entirely to his non-cooperation with medical experts and non-use of his right foot which was affected by the accident. In effect, the defendant admits that the plaintiff's right foot was injured by an accident as alleged but that the fracture *Page 751 
resulting from the accident completely healed and that after the treatment given him over a period of twenty weeks and the workmen's compensation paid him during that period, he completely recovered from the accident save and except for his failure to reasonably co-operate with the medical experts to whom he was referred by the defendant.
After trial of the case, the lower Court rendered judgment in favor of plaintiff for the sum of 400 weeks compensation from August 8, 1947, at the rate of $19.50 per week less 20 weekly payments of $19.50 already paid, and for the sum of $82.94 medical expenses advanced by plaintiff's attorneys, plus interest from date of judicial demand, and for all costs of this suit.
A review of the evidence clearly shows that the accident on which this claim for workmen's compensation is based actually occurred on the date and place alleged and while the plaintiff was in the course and scope of his employment. There is no dispute on that point. The only real dispute in the case is whether or not the plaintiff has actually sustained an injury to his right foot which has permanently disabled him from doing the work he was performing at the time of his injury and for which he is fitted by training and experience. It is admitted that the plaintiff is an uneducated man and that he must earn his living by hard manual work such as he was doing at the time of his injury. It also appears from the evidence that he has been unable to perform that type of work since his injury. He states that he has tried to do so with no success and is corroborated by at least one witness, to-wit, Mr. Arville Manuel, who testified that he operates a store, meat market and rice mill; that in March, 1948, he gave employment to the plaintiff because plaintiff owed him money for groceries and in order to assist plaintiff in lowering his bill; that he kept plaintiff for two and a half (2 1/2) days but that at noon on the third day, plaintiff's foot swelled and he complained that he could not keep on working; that he then brought plaintiff to Dr. Reed Fontenot at Ville Platte for treatment.
Dr. Reed Fontenot testified that plaintiff came to his office on March 18, 1948 and complained of pain and swelling of his right foot. The doctor states that at that time he examined him and "* * * he had moderate swelling and pain. The medial side of his ankle — that was so I got the history from him and decided to take some X-ray plates on it. At the time of the X-ray plates I told him there was a difference in the two feet. His right foot was more flat than the left. The bone was completely healed. I told him he had fallen arches and some injury to the ligaments." Dr. Fontenot further stated that the plaintiff complained of pain and that considering the discoloration which he found, he felt sure he had pain. He also testified that he noticed pain in testing for spasm under the arch of his foot. Dr. Fontenot testified further that he treated him over a period of weeks, his treatment being diathermy treatment and that he always found plaintiff co-operative during these treatments. He recalls the time when plaintiff's foot was in a cast and complained of pain and blisters and that he told plaintiff to go see Dr. Caldwell; that he did not touch the cast. His final conclusion is to the effect that, in his opinion, plaintiff has a condition that will prevent him from ever doing the same kind of work that he was doing prior to the time of the accident except possibly to a moderate amount. He, in effect, was of the opinion that his condition is one of traumatic arthritis due to the accident.
Dr. Caldwell testified by deposition that he examined plaintiff who gave him a history of an injury sustained on August 7, 1947 in which a 25-foot length of three-inch pipe was dropped on the top of his right foot; that such a blow might reasonably produce a fracture of the second metatarsal bone such as is seen in the X-rays. Upon being asked the question, "* * * doctor, what could be the cause of the condition of traumatic arthritis that you diagnosed?" Dr. Caldwell answered,
"The traumatic arthritis was involving joints in the middle portion of the right foot in and about the arch of the foot, and I think might reasonably be attributed to the same injury."
The doctor further testified with reference to the injuries he found and his ability *Page 752 
to perform the duties usually performed by a trucker's helper or common laborer, "I think that would totally incapacitate him for such work." Testifying further, he states that he found no appreciable improvement in patient's condition over a period of three months but he does state that,
"* * * All such cases I have ever seen recover to the point of being able to do — to walk and do some kind of work so that I don't feel that he would be necessarily permanently totally disabled entirely."
Dr. Caldwell's diagnosis from his examination of plaintiff is apparently summed up in his statement as follows:
"I think he has not reached the stage of maximum improvement as yet, and further treatment and time will be necessary before he will reach such a stage and the extent of partial disability that may be permanent can be estimated."
Dr. Hatchette testified that he examined plaintiff on September 29, 1947. He says:
"Mr. Deshotels was sent to my office for consultation by Dr. P. B. LaHaye of Eunice, Louisiana. At that time Mr. Deshotels showed moderate swelling involving the entire right foot but which was more prominent over the metatarsal arch. All of the toes could be moved without pain except the second toe which caused some distress on movement. There was pressure pain over the dorsal and planta surfaces of the metatarsal arch at the second toe. At that time it was my opinion this patient had a fractured metatarsal bone, which showed on X-ray examination, and which was healing normally and in excellent position. It was also my opinion that this was sufficient to cause disability at that time and that the patient should start movement of his foot and weight bearing as tolerated. Healing of the bone was not considered to be complete and an estimate of thirty to sixty days was given for complete healing. It was recommended that the patient be returned after complete healing had occurred for additional examination and opinion."
He testified further that he examined plaintiff again on December 22, 1947, and:
"At that time the examination showed a minimal amount of swelling about the ankle joint. The transverse arches of the foot were considerably depressed. There was no pain on pressure and movement of the foot and ankle on normal and passive motion. He complained that most of his pain was over the main arch of his foot, which was noticeable only on walking or weight bearing. It was my opinion at that time that arch supports and shoe correction should be furnished the patient. These were given to him and he stated that he felt some relief; however, he continued using his walking cane for support on the right side. I felt that by doing away with the walking cane this man would rehabilitate his foot and ankle much more quickly; that the proper muscle tone and strength of ligaments would be brought about by usage better than by using a cane to support this member of his lower extremities. I gave the opinion that approximately one to three months would be necessary to bring about a resumption of normal walking. I also requested that the patient be impressed with the necessity of attempted walking without the use of his cane."
He states that as a result of this examination that he did not feel that plaintiff would have any difficulty or that he would have any trouble regaining the normal use of his foot. He states that plaintiff was entirely co-operative in the examination but that he wasn't able to watch him as a patient and to see that he carried out the instructions that he gave him relative to walking and relative to the use of his cane. He testified that he examined plaintiff again on October 15, 1948, and that at that time the patient showed considerable pronation of the right ankle with depression of the main and transverse arches of the foot; that the internal lateral ligaments had apparently given way to some extent and this was associated with much flattening of the longitudinal arch of the foot. X-ray examination at that time showed a depression of the main arch of the right foot and in comparison with the left foot it showed a depression of this arch. He says,
"It was my impression at that time that this patient had a painful foot and ankle *Page 753 
on the right side. At that time it was a little late to start recommending exercises in an effort to bring about rehabilitation when it was obvious that some permanent damage had been established to the right foot. It was my impression that Mr. Deshotels had a twenty-five per cent to thirty-five per cent permanent disability of the right foot and ankle on October 15, 1948. I also felt that he would be able to restore some part of the strength to his muscles and ligaments about the foot and ankle by exercise and usage. At that time I was of the opinion that he was not able to perform his usual work and that the condition of pronation and flattening of the main arch would remain as a permanent residence."
He testified further that referring back to his examination of March 4th, had plaintiff followed his instructions, he would not have anticipated the condition he found on October 14th. He states,
"I feel that his present condition is somewhat tied up with his accident in that if the man had not been injured he would not have received these severe relaxations and lack of muscle tone in the ligaments and muscles of his foot and ankle. If I may elaborate on that a little more for a moment, it is possible that this man had a pronated ankle with flat foot on the right side before he was injured. I didn't see him before his injury and am not familiar with the state that he was in at that time. If he did have pronation of the ankle and flattening of the main arch, then, the accident certainly aggravated the situation that he had at the time I saw him on March the fourth."
The doctor concludes that at the time of his last examination plaintiff was suffering from about a twenty-five per cent disability of his right foot and ankle and that he felt that plaintiff would improve considerably and that he still needs a great deal of usage of that foot and ankle in order to bring strength back to it; that he believes that plaintiff willeventually be able to do the type of work that will afford him a living. He feels that an additional period of six months should be given plaintiff in order for him to attain the maximum period of improvement. He denies that he found any condition of traumatic arthritis in plaintiff's right foot. He admits that plaintiff cannot do exceedingly heavy work but he thinks that he should attempt any kind of work which is available to him such as digging ditches or sweeping out, or any type of duty that doesn't involve too much carrying or heavy weight bearing on that foot.
It seems clear that the preponderance of the medical testimony corroborates plaintiff's testimony to the effect that he is unable to do the work that he was doing at the time of his injury and consequently there appears to be no manifest error in the finding of fact of the trial judge to the effect that plaintiff has sustained the burden of proving that he is totally and permanently disabled within the purview of the workmen's compensation act.
On the question of non-co-operation, Dr. Hatchette has no reason to say plaintiff did not co-operate. He admits that he was cooperative on examination but was unable to follow him and watch him as a patient to see that he carried out instructions to use his foot in lighter work. Yet, his testimony reveals that it was on March 4, 1948 that he told plaintiff he should use his foot in light work and right after that plaintiff did try as he secured employment with Manuel but could only work 2 1/2 days because of pain he suffered. He followed this by going right away to see Dr. Fontenot who found him to be very co-operative.
Dr. Caldwell's testimony is surely not enough to convict him of non-co-operation. In referring to this he says he was not cooperative in carrying out instructions "some of which perhaps was his own fault and some unavoidable."
In so far as the judgment below is concerned, the award should have been for a period not to exceed four hundred (400) weeks less a credit of payments heretofore made for a period of twenty (20) weeks and the interest awarded should be not from judicial demand but from the delinquency date of each instalment. The defendant raised the question with reference to medical expenses awarded in the sum of $82.94, that such award brings the total medical expenses slightly in excess of $500. It appears, however, that the medical expense *Page 754 
of $82.94 was voluntarily agreed by the defendant at the time that this debt was contracted for by plaintiff's attorneys and that therefore the award is proper.
The judgment will be recasted to read as follows:
It is ordered, adjudged and decreed that there be judgment for plaintiff for workmen's compensation at the rate of $19.50 per week for a period not to exceed four hundred (400) weeks, less a credit for payments heretofore made of twenty (20) weeks, plus interest at the rate of five (5%) per cent per annum on all delinquent instalments from the due date of each instalment plus the sum of $82.94 for medical expenses and all costs herein. As thus recast the judgment is affirmed.